Mildred M. PECK, etc.,
Plaintiff, Appellee,

v.

Susan GARFIELD, et al.,
Defendants, Appellants.

No. 88–1157.

United States Court of Appeals,
First Circuit.

Heard Oct. 5, 1988.

Decided Nov. 30, 1988.

William G. White, with whom Kevin D. Withers and Ryan & White, P.C., Springfield, Mass., were on brief, for defendants, appellants.

Jack D. Curtiss, with whom Callahan, Curtiss, Carey & Gates, Greenfield, Mass., was on brief, for plaintiff, appellee.

Before BREYER, Circuit Judge, TIMBERS,* Senior Circuit Judge, and TORRUELLA, Circuit Judge.

TIMBERS, Circuit Judge:

Appellants Susan L. Garfield ("Garfield"), Bob's Service Center, Inc., Transport Automotive Warehouse and Overseas Auto Parts, Inc., and/or Overseas Auto Parts, Inc. (collectively "appellants") appeal from a judgment entered December 17, 1987 in the District of Massachusetts, Western Section, Michael A. Ponsor, *Magistrate*, upon a jury verdict in favor of Mildred C. Peck, administratrix of the estate of Edwin C. Peck ("Peck"), awarding compensatory and punitive damages in a wrongful death action arising from an automobile accident. The appeal brings up for review a subsequent order entered December 28, 1987 denying appellants' post-trial motion for a new trial pursuant to Fed.R.Civ.P. 59(b).

Appellants claim that the magistrate abused his discretion in denying the post-trial motion because (1) the jury's finding that Peck's contributory negligence was

* Of the Second Circuit, sitting by designation.

not a proximate cause of his death was so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice and (2) the award of more than $300,000 in damages under the wrongful death statute for loss of future intangibles such as protection, care and society was unconscionable because Peck was 80 years of age at the time of his death. Appellants also claim that it was error for the magistrate to have submitted to the jury the question of punitive damages because there was insufficient evidence as a matter of law to support a finding that appellants were grossly negligent.

We affirm.

## I.

We shall summarize only those facts believed to be necessary to an understanding of the issues raised on appeal.

On December 26, 1985, Peck, a pedestrian, was struck and killed by a pickup truck driven by Garfield. He was killed while crossing Bernardston Road (U.S. Route 5) in front of his home in Greenfield, Massachusetts. At the time of the accident Garfield was delivering auto parts for her employers who are the remaining appellants.

The scene of the accident is a two lane rural highway, approximately 30 feet wide, each lane being 15 feet in width. It is divided in the center by two yellow lines, with one white line running along the outer edge of each lane. There also are two breakdown lanes, one on each side of the highway. On the morning of the accident Garfield was heading south in the southbound lane. Upon approaching the site of the accident in this direction, one notices that the highway makes a large curve to the left. The highway at this curve rises at a four percent grade. Although the curve is significant, photos do not indicate that it is particularly dangerous. About 50 to 75 feet north of the crest of the grade the highway straightens out and the breakdown lanes narrow. The length of the curve was estimated at trial to be between 250 and 275 feet. A police officer familiar with the scene estimated that the crest could be seen from at least 250 feet in the

direction of Garfield's approach; he further estimated (based on viewing a photograph) that the crest might be visible as far away as 1000 feet. Peck was struck and killed while crossing the highway at the crest. The accident was witnessed by three people: Garfield and two motorists who approached the scene while heading north. Both motorists and Garfield testified at the trial.

The accident occurred at approximately 10:30 A.M. It was sunny but below freezing. The highway was clear and dry. A snowbank covered the southbound breakdown lane up to the white line at the edge of the traveled surface of the highway. As Peck began to cross the highway, he entered the northbound lane without looking in either direction. He approached Garfield from her left just as Garfield approached him from the north. He continued across the northbound lane to the center of the highway without looking in either direction. He continued into the southbound lane (in which Garfield was approaching), again without looking. He was between one-third and one-half of the way across the southbound lane when he seemed to hesitate and look north toward Garfield. Garfield appears to have seen him at about the same moment. At the time she first saw Peck, Garfield estimated her distance from him to have been about 90 feet. She downshifted and began to brake. At some point she went into a skid and swerved to her left toward the center of the highway, intending to pass Peck to her left. She testified that she could not enter the northbound lane because of approaching traffic. She never considered passing Peck to her right because of the snowbank in the breakdown lane.

Upon seeing Garfield, Peck retreated to the center of the highway (whether by backing or turning around is unclear). Upon reaching the center, Peck again stepped into the southbound lane. It is at this point that one witness testified that Garfield began to swerve toward the center of the highway. Peck once again stepped back toward the center of the highway. Upon reaching it, he was struck by the

right front end of Garfield's truck. His body struck and cracked the truck's windshield. He was hurled ten feet into the air, landing 39.6 feet from the point of impact. He was removed to a local hospital where he died shortly after arrival. His injuries were extensive, including severe head, shoulder, chest, back and leg injuries, and serious internal organ damage.

At trial, Garfield was uncertain of her speed at the time she first saw Peck. She first estimated her speed to have been 45 miles per hour (the speed limit), then 40 miles per hour, and then made no estimate at all. Investigators who analyzed her skid marks estimated that she was traveling at 42 miles per hour at a minimum. For her speed to have been the minimum, it would have to be assumed that she did not slow down prior to entering the skid and that at the end of the skid the truck was at a complete stop. The latter is unlikely because the truck skidded only 7.7 feet beyond the point of impact, and then proceeded a considerable distance before coming to a stop 171.2 feet from the point of impact. Also, despite the fact that impact occurred only 7.7 feet beyond the end of the skid, Peck suffered massive injuries.

Peck's widow and administratrix ("appellee") commenced a wrongful death action in the United States District Court pursuant to Mass.Gen.L.Ann. ch. 229, § 2 (1985) ("wrongful death statute").[1] The jury returned a special verdict finding that Garfield's negligence had caused Peck's death. The jury also found that Peck had been contributorily negligent, but that this was not a proximate cause of his death. The jury awarded Peck's estate $400,000 in compensatory damages, more than $300,000 of which was for the loss of such intangibles as "protection, care, assist-

ance". Mass.Gen.L.Ann. ch. 229, § 2 (1985). It also awarded 12% interest. Finally, it awarded $5,000 in punitive damages under the wrongful death statute, apparently finding that Garfield had been grossly negligent. At trial, appellants moved to exclude a jury instruction on punitive damages on the ground that there was insufficient evidence as a matter of law of any conduct by Garfield warranting punitive damages under the wrongful death statute.

The magistrate denied appellants' post-trial motion for a new trial pursuant to Fed.R.Civ.P. 59(b). Appellants claim that the denial of the motion constituted an abuse of discretion because (1) the jury's finding that Peck's contributory negligence was not a proximate cause of his death was so contrary to the evidence that it constituted a manifest miscarriage of justice and (2) the award of more than $300,000 in damages for lost future intangibles was unconscionable because of Peck's age. Appellants also challenge the magistrate's denial of their motion at trial to exclude the jury instruction on punitive damages.

## II.

In a special verdict, the jury found that Peck had been contributorily negligent, but that this was not a proximate cause of his death. Appellants claim that this was so contrary to the evidence that the magistrate abused his discretion in denying the motion for a new trial. In reviewing the denial of a motion for a new trial on the ground that the verdict was contrary to the evidence, we will find an abuse of discretion only if "the jury's verdict was so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice". *Wagenmann v.*

---

1. The Massachusetts wrongful death statute provides in relevant part:

 "A person who (1) by his negligence causes the death of a person ... shall be liable in damages in the amount of: (1) the fair monetary value of the decedent to the persons entitled to receive the damages recovered ... including but not limited to compensation for the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance,

counsel, and advice of the decedent to the persons entitled to the damages recovered; (2) the reasonable funeral and burial expenses of the decedent; (3) punitive damages in an amount of not less than five thousand dollars in such case as the decedent's death was caused by the malicious, willful, wanton or reckless conduct of the defendant or by the gross negligence of the defendant".
Mass.Gen.L.Ann. ch. 229, § 2 (1985).

**4**

*Adams,* 829 F.2d 196, 200–01 (1st Cir.1987) (quoting *Hubbard v. Faros Fisheries, Inc.,* 626 F.2d 196, 200 (1st Cir.1980)).

At trial appellants claimed that Peck was contributorily negligent when he entered the road without looking because, if he had looked before doing so and had seen Garfield's approach, he would have waited for her to pass. There is sufficient evidence, however, from which the jury could have found or inferred that, if this failure to look was contributory negligence, it was not a proximate cause of Peck's death. First, it was permissible for the jury to infer that Garfield was traveling at an excessive rate of speed. The evidence of this includes the height and distance Peck's body was hurled by the impact, the injuries Peck sustained, the fact that Garfield did not see him until she was 90 feet away, and the distance the truck continued following impact. Second, from Peck's perspective the road would have curved around to his right in the direction of Garfield's approach, placing part of the approach somewhat behind him and below the crest of the grade. This would have required him to look beyond whatever obstructions lined the side of the road to have seen at least part of Garfield's approach. Finally, the jury might permissibly have found that the failure to look was not contributory negligence at all, at least with respect to a vehicle approaching in the opposite lane. It can hardly be said that such a finding, or a finding that the failure to look before entering the road was not a proximate cause of Peck's death, was so contrary to the evidence as to be a manifest miscarriage of justice.

Appellants also claim that Peck was contributorily negligent because after seeing Garfield's truck he "stepped into" its oncoming path. The crux of this claim is that, when Peck stepped back to the center of the road for a second time, he stepped into Garfield's path as she tried to pass behind him. Appellants view the impact of the body on the right front end of Garfield's truck as indicating that, had Peck kept going toward the westerly side of the road, Garfield would have missed him. This would require a finding as contribu-

torily negligent the acts of a man confronted by a truck approaching at high speed, where he is given at most a second or two to deduce what the truck will do and then to act on that deduction.

Even if the jury decided that Peck's actions upon seeing Garfield's approach constituted contributory negligence, it is not so totally against the evidence as to be a manifest injustice for the jury to have found that such negligence made no difference, in view of the likelihood that Garfield was travelling at an excessive speed and quite possibly was inattentive. Evidence that Garfield was inattentive includes testimony and accompanying photographs suggesting that she should have seen Peck from at least 250 feet away.

Finally, appellants cite *Woodward v. City,* 322 Mass. 197, 76 N.E.2d 656 (1948), for the proposition that a pedestrian who steps from a place of safety into the path of an oncoming car is contributorily negligent as a matter of law. The holding in *Woodward,* however, was clearly limited to the facts of the case. *Woodward, supra,* 322 Mass. at 200, 76 N.E.2d at 657 ("The issue is the narrow one whether it was contributory negligence, as a matter of law, for the plaintiff to walk toward the path of the automobile which she testified she saw thirty-four feet away approaching at thirty miles an hour."). The facts of *Woodward* are clearly distinguishable furthermore because it involved an accident on a city street on a rainy afternoon. *Woodward, supra,* 322 Mass. at 197–99, 76 N.E. 2d at 656–57.

In view of the evidence presented to the jury in the instant case and the permissible inferences to be drawn therefrom, we hold that there was more than sufficient evidence from which the jury could have found or inferred that Peck's contributory negligence was not a proximate cause of his death. There was no manifest miscarriage of justice.

## III.

 Under the Massachusetts wrongful death statute, damages may be awarded

for loss of "reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the decedent". Mass.Gen.L.Ann. ch. 229, § 2 (1985). Funeral and medical expenses also may be recovered. *Id.* In the instant case $85,-599.34 of the damages awarded were special damages such as medical and funeral expenses and lost net income, clearly proven by documentary evidence or expert testimony. The remaining $314,400.66 of compensatory damages was attributed to the loss of "intangibles" listed in the wrongful death statute. Appellants claim that, since Peck was 80 years of age at the time of his death, this damage award is so clearly excessive that the magistrate abused his discretion in denying the motion for a new trial.

In this Circuit, a court will not be said to have abused its discretion in denying a motion for a new trial based on an excessive damage award unless the jury's verdict is grossly excessive or shocking to the conscience. *Joia v. Jo–Ja Serv. Corp.*, 817 F.2d 908, 918 (1st Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 703 (1988); *Brown v. Freedman Baking Co.*, 810 F.2d 6, 11 (1st Cir.1987). The justification for this standard is that the trial court is more aware than we of local community standards and has observed first-hand the witnesses' demeanor. *Id.* The evidence must be viewed in the light most favorable to appellee. *Joia, supra,* 817 F.2d at 918.

At his death, Peck had a life expectancy of seven years. Appellants claim that, in view of this short expectancy and the probability that Peck would decline over this period, the award was excessive. The uncontroverted testimony at trial established, however, that Peck was still quite healthy, mentally alert, and active in his public and private life. An inference was reasonable that Peck would not have declined very much over the remaining years of his expected life and that he might have lived a rewarding life considerably beyond seven years.

Furthermore, Peck and his wife had been married for fifty-one years. Testimony at trial showed that the marriage had been very happy and that the two were still close. Testimony also showed that Peck's wife had been dependent upon him in many ways. In view of the nature of this relationship, even if Peck had lived only seven more years, it cannot be said that an award of essentially $45,000 dollars a year for each lost year of life shocks the conscience. And if the jury had found, as it reasonably might have, that Peck might well have lived beyond seven years, the award becomes even more defensible. We hold that, in view of the evidence in the instant case, viewed in the light most favorably to appellee, it cannot be said that the damage award shocks the conscience.

## IV.

■ The Massachusetts wrongful death statute permits an award of punitive damages if the decedent's death was caused by "the malicious, willful, wanton or reckless conduct of the defendant or by the gross negligence of the defendant". Mass.Gen. L.Ann. ch. 229, § 2 (1985). At trial, appellants objected to a jury instruction permitting the jury to award punitive damages under the wrongful death statute on the ground that there was insufficient evidence as a matter of law that appellants had engaged in any of the conduct delineated in the statute.[2] On appeal both parties have concentrated on the statutory component of gross negligence. It is on that component that we will focus our analysis.

Gross negligence is "substantially and appreciably higher in magnitude than ordinary negligence.... It is ... the absence of slight diligence, or the want of even scant care." *Altman v. Aronson*, 231 Mass. 588, 592, 121 N.E. 505, 507 (1919). In the context of automobile accidents, while there is no hard and fast rule, the three elements usually taken into consideration are the speed of the vehicle, the cir-

---

2. Appellants' objection to the jury instruction on punitive damages, coupled with the magistrate's statement on the record that their objection was preserved, is more than sufficient to preserve the claim of error on appeal.

cumstances and conditions at the site of the accident, and the length of any inattentiveness. For example, only momentary inattentiveness may be gross negligence in a place of great danger or while traveling at high speed. *E.g., Hallett v. Rimer*, 329 Mass. 61, 106 N.E.2d 427 (1952); *Dinardi v. Herook*, 328 Mass. 572, 105 N.E.2d 197 (1952) (and cases cited therein); *Picarello v. Rodakis*, 299 Mass. 33, 11 N.E.2d 470 (1937).

While we believe that this is a close question, we hold that there was enough evidence of gross negligence to submit this question to the jury, viewing such evidence in the light most favorable to appellee. First, there is considerable evidence that Garfield was traveling at a grossly excessive speed. The speed limit at the site of the accident was 45 miles per hour. The length of the skid marks was consistent with Garfield having been traveling at a speed of 42 miles per hour when she began to skid only if she did not brake at all prior to the beginning of the skid and was at a complete stop when the skid ended. Yet, while her vehicle struck Peck only 7.7 feet prior to the end of the skid, his body was hurled ten feet into the air and nearly 40 feet from the point of impact. He sustained massive injuries. The truck proceeded 171.2 feet after impact until it came to a stop. Finally, Garfield claims that she did not see him until he was 90 feet away. This leads to the inference that she came upon him at a high rate of speed. Taking all of this evidence, it was permissible for the jury to have found that Garfield was traveling at a grossly excessive speed.

Second, the evidence permitted the jury to find that Garfield also was inattentive for at least several seconds. She testified that she saw Peck when he was 90 feet away. Yet there was evidence that she should have seen him at least 250 feet away, and some evidence suggests that she might have seen him 500–600 feet away, or even as far away as 1000 feet. If one makes a hardly unreasonable assumption in view of the evidence that Garfield should have seen Peck 500 feet away, assumes she was traveling 60 miles an hour (88 feet per second), and if one accepts her estimate of having seen him 90 feet away, that leads to a reasonable inference of at least 5 seconds of inattention. We cannot say that at 60 miles per hour 5 seconds of inattention is not grossly negligent, especially when such inattention occurs when traveling on a curve.

We recognize that this is a close question. We believe, however, that it is wise to heed the words of the Supreme Judicial Court of Massachusetts:

"Doubtless there may be cases so near the borderline that a tribunal whose duty it is to apply only legal principles cannot reverse that factual conclusion embodied in a verdict. The power so to do must be exercised with the utmost caution."

*Burke v. Cooke*, 246 Mass. 518, 521, 141 N.E. 585, 587 (1923). We believe that this is a question upon which it is wiser to stay our hand. We hold that there was sufficient evidence of gross negligence for the magistrate to have submitted the question of punitive damages to the jury.

### V.

To summarize:

We affirm the judgment for appellee entered on the jury verdict. We hold that the magistrate did not abuse his discretion in denying the motion for a new trial. The jury's finding that Peck's contributory negligence was not a proximate cause of his death was not so contrary to the evidence as to constitute a manifest miscarriage of justice. We also hold that the jury's award of damages was not so excessive as to shock the conscience. Finally, we hold that the magistrate did not err in submitting the question of punitive damages to the jury.

AFFIRMED.